THORSON and another *v.* PETERSON and others.

*(District Court, N. D. Illinois. November 26, 1881.)*

**1. EVIDENCE.**
Courts will take judicial notice of the boundaries of the different states.

**2. CONTRACTS OF SEAMEN.**
Seamen's contracts to ship on a sailing-vessel for the voyage are terminable at the will of the parties, on her arrival at a port of safety, by the dismasting of the vessel in a collision.

In Admiralty.

*W. H. Condon,* for libellants.

*C. E. Kremer,* for respondents.

BLODGETT, D. J., *(orally.)* This is a libel for wages, and charges that on the seventeenth of November, 1880, libellants shipped on the schooner Winnie Wing, of which respondents were owners, and the

respondent Peterson was also captain,—Thorson as mate and Oleson as seaman,—for a voyage from Chicago to Pentwater, Michigan, and return; that the schooner sailed on her voyage the day libellants were employed, but during the morning of the next day she had a collision with another vessel, was dismasted, and rendered incapable of proceeding on her voyage, and, on the afternoon of the eighteenth of November, was towed into South Haven harbor, where she remained about 10 days, when she was towed to Pentwater, her port of destination, where she arrived on the thirtieth of November. The defence set up is that both the libellants were shipped for the round trip, at a gross sum of $20 each, and that on the arrival of the schooner at Pentwater they refused to assist in unloading the schooner, although the master, in view of the fact that the schooner, by reason of the accident to her, was unable to return to Chicago that fall, offered to pay the full wages for the round trip and libellants' expenses back to Chicago, which they refused to receive. And respondents aver that since said offer they have always been ready and willing, and are still ready and willing and able, to pay the amount so offered, which they insist is the full amount to which the libellants are entitled.

The proof in this case shows to my satisfaction that Thorson was not employed at a gross sum for the round trip, but was employed by the day, at the rate of $3.50 per day. It appears from the evidence that for two or three trips made by this schooner, preceding the Pentwater voyage, Thorson had been employed as mate, at $3.50 per day, and that on her return from the last trip, preceding the Pentwater trip, he did not leave the schooner, but remained on board of her and assisted in taking on a cargo of grain for Pentwater; and in the absence of controlling proof of a new contract for the Pentwater voyage, I must find that he was continued for the Pentwater voyage in the same capacity and on the same terms on which he had been employed in former voyages.

As to Oleson, the evidence is undisputed that he was employed for the round trip for the sum of $20; but after the vessel arrived in South Haven he insisted upon leaving, saying that he wished to go to Chicago and ship on some vessel bound for Buffalo, whereby he would get large wages and have employment for the rest of the season of navigation. The captain refused to allow him to leave, and told him that if he would remain on board until the vessel was safe in Pentwater he would "do what was right by him," and Oleson accordingly remained on board and did duty until the vessel arrived in Pentwater. Thorson remained on the schooner during the time she lay in South Haven

harbor and until her arrival in Pentwater, doing duty as mate all the time she was in South Haven harbor, and he had full charge of the vessel part of the time, because the captain was absent looking for a tug.

On the arrival of the vessel at Pentwater, the captain announced to Thorson and Oleson that he intended to pay them the sum of $20 each, and $7 extra, which would pay their fare to Chicago, and that he considered them both as employed by the round trip, and that they were bound by their obligation to remain on board until the vessel was unloaded; and that he would only pay them what he proposed to pay on condition that they did so remain on board and assist in unloading. On this announcement both libellants left, and the captain refused to pay them any wages or advance them any money on account of their services.

The libellants further claim that the master of the vessel, having employed them without shipping articles, is liable, under sections 4520 and 4521 of the Revised Statutes of the United States, to pay them the highest wages which shall have been given for the preceding three months at the port of shipment, and insist that the proof shows such wages to be four dollars per day for seamen, and four dollars and twenty-five cents per day for mates, and that, therefore, they are entitled to recover wages at these rates. But this statute is only applicable to voyages from a port in one state to a port "in any other than an adjoining state," and, as this court is bound to take notice of the legally-established boundaries of the different states, it must be held that Illinois and Michigan are "adjoining states" within the meaning of this statute. The boundary line is the middle of Lake Michigan, and the process of this court, for instance, or an Illinois state court, could, undoubtedly, be executed on the lake anywhere west of this boundary line. The mere fact that the boundary line is upon the water, and therefore, perhaps, difficult to determine by physical boundaries, or lines palpable to the eye, does not change the operation of the statute in this respect. So that these seamen cannot either of them, I think, invoke this statute in aid of their case, and recover larger wages on the ground that the master hired them without shipping articles.

As I have already said, there is no doubt that Oleson shipped for the round trip from Chicago to Pentwater and return at the gross sum of $20. But I am satisfied that by the dismasting of the schooner the voyage was broken up, and the seamen who had shipped for the voyage were at liberty to leave as soon as the vessel was in a

port of safety, the contract for the voyage being terminated by the inter positionof the *vis major*. *The Dawn*, 2 Ware, 126; *Miller* v. *Kelly*, Abb. Adm. 564; 3 Kent, 196. Being dismasted she could no longer, as a sailing vessel, continue and complete her voyage, and did not attempt to do so, but was subsequently taken to her port of destination by the assistance of a tug.

This breaking up of the voyage by disaster was one of the contingencies of the employment which I must presume to have been contemplated by both parties at the time the contract was made. After the schooner was in a port of safety, and it had become practically impossible to complete the contract, and both parties were by the disaster absolved from it, Oleson had, in my opinion, no right to claim that any wages had been earned upon the original hiring, because the original contract was an entirety; but he could, as I have already said, if he chose, leave the vessel at that time. Indeed, I am not sure but that if he remained on board after the vessel arrived at South Haven, with the knowledge and acquiescence of the master, the law would imply a new hiring under the new circumstances which surrounded both parties. But without passing directly upon the question as to whether the law would or would not imply a new hiring, it is sufficient to say that the proof satisfies me in this case that there was a new employment of Oleson by the master. The promise was that if he would remain on board he would do what was right by him, which implied that he would pay him such wages as his services were reasonably worth. He did remain on board and perform his duty until the vessel arrived at Pentwater, and only left when the captain denied his obligation under any new hiring, and insisted that the men were bound by the contract made in Chicago before the sailing of the schooner.

I have no doubt that, when the captain repudiated the contract made, the libellants had the right to leave the vessel and sue for and recover in this action whatever was then due them. The conduct of the captain towards these men does not seem to me to indicate that he was willing or intended to do what was right with them under the circumstances. There is no proof that he could not have obtained a tug immediately after the vessel took shelter in South Haven harbor; but it is evident that he took his own time to make the best bargain he could with a tug after the season had nearly or substantially closed, so as to get his vessel towed to Pentwater at the lowest possible price, and during all this time he kept these men on his vessel when they could have been earning higher wages than he finally

proposed to pay them, and, undoubtedly, under an implied if not an express promise that he would pay them full wages.

There was no treaty or contract with Thorson in regard to the amount of his wages for this special voyage, and I must, therefore, assume that he can only claim the rate of wages of his former voyages, which was $3.50 per day. The proof would satisfy me that Oleson's wages were fairly worth $3.50 per day also, but the commissioner, after a review of all the testimony, has come to the conclusion that his wages should be $3.33, and I am not disposed to disturb that finding, as it seems to have been arrived at after a very careful analysis of all the testimony in the case bearing upon the question.

There will, therefore, be a decree in favor of Thorson at $3.50 per day from the seventeenth of November to the first day of December, and for Oleson at $3.33 per day from the nineteenth of November to the first of December.

The master also found that, under the promise to do what was right with Oleson, the captain was bound to pay his fare, which amounted to $7 from Pentwater to Chicago, and with this finding I can find no fault under the facts in the case. I do not see, however, from the proof that Thorson was entitled to be returned to Chicago at the expense of the vessel.